1

———TRANSCRIBED FROM DIGITAL RECORDING———

```
                    UNITED STATES DISTRICT COURT

                         DISTRICT OF NEVADA


UNITED STATES OF AMERICA,    )
                             )  Case No. 2:22-mj-00171-EJY
     Plaintiff,              )
                             )  Las Vegas, Nevada
     vs.                     )  Tuesday, March 8, 2022
                             )  Courtroom 3D
MATTHEW WADE BEASLEY,        )
                             )  Initial Appearance
     Defendant.              )
                             )  C E R T I F I E D   C O P Y
                             )
                             )
```

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE ELAYNA J. YOUCHAH,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                    See next page

DIGITALLY RECORDED:             Liberty Court Recorder (LCR)
                                2:34 p.m. - 2:53 p.m.

RECORDED BY:                    E. Garcia

TRANSCRIBED BY:                 Samantha N. McNett
                                Samantha_McNett@nvd.uscourts.gov

Proceedings recorded by electronic sound recording; transcript produced by machine shorthand and computer-aided transcription.

1  APPEARANCES:

2  For the Plaintiff:

3      **TONY LOPEZ, ESQ.**
       **ERIC SCHMALE, ESQ.**
4      U.S. ATTORNEY'S OFFICE
       501 Las Vegas Boulevard South
5      Suite 1100
       Las Vegas, Nevada 89101
6      702-388-6551

7
   For the Defendant:
8
       **ROBERT M. DRASKOVICH, ESQ.**
9      ROBERT M. DRASKOVICH, CHTD.
       815 South Casino Center
10     Las Vegas, Nevada 89101
       702-474-4222
11

12 Also Present:

13     Emily McKillip, Pretrial Services Officer

14
                         * * *
15

―――――――― TRANSCRIBED FROM DIGITAL RECORDING ――――――――

1        LAS VEGAS, NEVADA; TUESDAY, MARCH 8, 2022; 2:34 P.M.

2                          --oOo--

3                    P R O C E E D I N G S

4      THE COURTROOM ADMINISTRATOR:  This is the time set in

5  the case of 2:22-mj-171-EJY, United States of America versus

6  Matthew Wade Beasley.

7      Counsel, please enter your appearance for the record.

8      MR. LOPEZ:  Good afternoon, your Honor.  Tony Lopez

9  for the United States.  With me is AUSA Eric Schmale who may

10 have to leave before the hearing ends.

11     THE COURT:  Thank you.

12     MR. DRASKOVICH:  And good afternoon, your Honor.

13 Robert Draskovich on behalf of Mr. Beasley.

14     THE COURT:  Thank you.

15     All right.  Mr. Beasley, before we commence the

16 substance of this hearing, I must advise you that I am

17 authorized to hold this proceeding by videoconference.  That

18 authority comes from an act of Congress as well as an order

19 from the chief justice of the United States District Court for

20 the District of Nevada.

21     However, I need to ensure that you understand you have

22 the right to be here in person and that you are choosing to be

23 here by videoconference.

24     Do you wish to proceed today appearing by

25 videoconference, sir?

―――――――― TRANSCRIBED FROM DIGITAL RECORDING ――――――――

1      THE DEFENDANT:  Yes, your Honor.
2      THE COURT:  All right.  Thank you.
3      Would you state your full name for me, please?
4      THE DEFENDANT:  Matthew Wade Beasley.
5      THE COURT:  How old are you, sir?
6      THE DEFENDANT:  49.
7      THE COURT:  How many years of school did you complete?
8      THE DEFENDANT:  20.
9      THE COURT:  Thank you.
10     I do understand -- I believe you're an attorney.  Is
11 that right, sir?
12     THE DEFENDANT:  That is correct.
13     THE COURT:  All right.  Even though some of these
14 questions may be obvious to you, I need to go through them with
15 you irrespective of your legal training.
16     You are here today because a criminal complaint was
17 filed against you in the United States District Court for the
18 District of Nevada.  In that complaint, which was filed on
19 March 4, 2022, there is one count, and that count is assault on
20 a federal officer in violation of 18 USC Section 111(a)(1) and
21 111(b).
22     Have you received a copy of the complaint?
23     THE DEFENDANT:  Yes, I have, your Honor.
24     THE COURT:  And have you had a chance to review it?
25     THE DEFENDANT:  Yes, I have.

TRANSCRIBED FROM DIGITAL RECORDING

1   THE COURT: You're not required to make any statement
2   today at this proceeding or at any other time to anyone,
3   including law enforcement, about the charge in the complaint.
4   Anything you say can be used against you.
5        Do you understand that right?
6        THE DEFENDANT: Yes, your Honor.
7        THE COURT: You have the right to a preliminary
8   hearing, because this is a complaint, at which time the
9   Government is required to provide evidence of probable cause to
10  support the crime with which you have been charged in the
11  complaint.
12       At that hearing, you have the right to call witnesses,
13  to give evidence on your behalf, you have the right to
14  cross-examine witnesses who are called to give evidence against
15  you, and you have the right to take the witness stand and
16  testify on your own behalf, if you choose to do so, but you
17  cannot be compelled to do so and your choice not to do so
18  cannot be held against you or commented upon by the Court.
19       Do you understand those rights?
20       THE DEFENDANT: Yes, your Honor.
21       THE COURT: In the event that an indictment is
22  returned against you -- and I'm sure you understand what that
23  is, but I'll state it for the record -- that means that the
24  grand jury has met and found probable cause for the crime that
25  is alleged in the complaint. There will be, in that case, no

—————TRANSCRIBED FROM DIGITAL RECORDING—————

1  preliminary hearing.  The preliminary hearing will be vacated.
2          I know that you have retained counsel in this matter,
3  and I have a copy of the designated -- a designation of
4  retained counsel in front of me, which will be entered -- or
5  has been entered in the Court.
6          Did you have a chance to speak with your counsel
7  before today's hearing about the charge?
8          THE DEFENDANT:  Yes, I have.
9          THE COURT:  And do you understand what you are charged
10 with?
11         THE DEFENDANT:  Yes, I -- yes, I do.
12         THE COURT:  Mr. Draskovich, do you have any reason to
13 question the competence of Mr. Beasley or his ability to assist
14 you in his defense going forward?
15         MR. DRASKOVICH:  No, I do not.
16         THE COURT:  Thank you.
17         The preliminary hearing in this matter is set for
18 Tuesday, March 22, 2022 at 4:00 p.m. in courtroom 3B.
19         We will now proceed with the detention hearing.
20         Mr. Lopez, is the Government prepared to go forward
21 today with detention?
22         MR. LOPEZ:  Yes, your Honor.
23         THE COURT:  And are -- and are you seeking detention,
24 sir?
25         MR. LOPEZ:  Yes, your Honor.  The Government seeks

TRANSCRIBED FROM DIGITAL RECORDING

1  detention under 3142(f)(1) and (f)(2).
2           THE COURT:  Thank you.
3           And Mr. Draskovich, are you prepared to go forward
4  today with the detention hearing?
5           MR. DRASKOVICH:  Yes, I am.
6           THE COURT:  And are you seeking release for your
7  client?
8           MR. DRASKOVICH:  Yes, I am.
9           THE COURT:  All right.  Mr. Lopez, would you please
10 make your presentation first.
11          MR. LOPEZ:  Thank you, your Honor.
12          The Government concurs with pretrial services's
13 recommendation that the Court detain the defendant as both a
14 risk of nonappearance and a danger to himself and the
15 community.
16          The defendant is accused of a crime of violence,
17 assaulting FBI agents by brandishing a firearm at them causing
18 the agents to shoot him and striking him in the chest and
19 shoulder.
20          After the shooting, the defendant retreated into his
21 home and refused to come out for nearly four hours despite
22 suffering from two bullet wounds and in need of medical
23 attention.
24          While the defendant was speaking with the FBI
25 negotiator trying to get him out of the house, the defendant

1  repeatedly confessed to his involvement in what he described as
2  a Ponzi scheme.  He repeatedly claimed that he wished the
3  agents had killed him.  And he repeatedly stated that the
4  stand-off was going to end with him dead, killing himself
5  because he could not go to prison and he was unwilling to come
6  out of the house alive.
7           Now, in his report to pretrial services, the defendant
8  claimed that he thought of attempting suicide after he was shot
9  and lying in his own blood, but this significantly minimizes
10 what happened here.
11          First of all, before he was shot, he held a gun to his
12 head when the FBI appeared at his door.  After he was shot,
13 over and over again for several hours, the defendant told the
14 FBI negotiator that this was going to end with the defendant
15 killing himself.
16          So despite the best efforts of the negotiator, the
17 defendant never came out voluntarily.  And the FBI SWAT team
18 had to forcibly enter the home and bring him out.  When they
19 did, the FBI recovered the defendant's firearm and discovered
20 it was loaded indicating that he was capable of harming the
21 agents but also capable of following through on his threats to
22 kill himself during the stand-off.
23          This was also not a "spur of the moment" act.
24 Bringing this gun to the door was premeditated.  The defendant
25 said that he expected the FBI to come for him that day because

1   the FBI visited an associate earlier.  Out front, the FBI rang
2   a Ring brand doorbell.  Those often have a camera that display
3   real-time video where the -- which may have allowed the
4   defendant to see who was there.  And when he came to the front
5   door, the defendant already had a gun in his hand, which shows
6   he knew who was coming.
7           So while the defendant faces a significant sentence
8   for the conduct charged in this complaint, he also faces a
9   significant sentence for the Ponzi scheme I mentioned earlier
10  that he admitted orchestrating.  He told the FBI negotiator
11  that the scheme started as far back as 2017 and involved
12  $300 million.  This is the potential prison exposure that
13  triggered his extreme reaction when the FBI came to his door.
14          At one point, the defendant told the negotiator that
15  his bank records will make it all clear.  And on that point,
16  the defendant is correct.  He's an attorney with an IOLTA
17  account that tells a clear story.
18          Since 2017, the defendant has taken in more than
19  $300 million through that IOLTA account.  This nine figure
20  Ponzi scheme is what made the defendant hole up in his house
21  for four hours until the FBI had to literally drag him out.  He
22  was willing to take his own life rather than answer for his
23  actions.  He expressly told the negotiator he wished the FBI
24  had killed him so he didn't have to do it himself.
25          At a minimum, the defendant is an extreme danger to

1  himself.
2       But even if he doesn't harm himself, he's a danger of
3  fleeing if he's released.  His financial disclosure to pretrial
4  services shows that he has accumulated significant assets
5  during the course of this Ponzi scheme he admitted to:  A
6  $4 million home near Tahoe, the $1.8 million home where the
7  assault took place, two other residences worth almost a million
8  dollars combined, an RV worth almost half a million dollars, a
9  $300,000 Bentley, a $300,000 Ferrari, and a $100,000 Escalade.
10      Notably, the defendant claims to only have $40,000 in
11 bank accounts which is suspiciously low given the volume of
12 funds that he took in and the assets he's acquired.  It's also
13 inconsistent with the bank statements for his IOLTA account.
14 We do not have bank statements yet from 2022, but the most
15 recent statements that we have from 2021 show average daily
16 balances of $3- to $4 million.  So it seems surprising that the
17 defendant now claims he only has $40,000 in the bank.
18      The defendant's words and actions from March 3rd, the
19 day he brandished the gun in front of the FBI agents, those
20 words and actions were erratic, desperate, dangerous.  He
21 refused to come out of his home for four hours rather than get
22 the medical attention he needed.  He would have rather died in
23 his home bleeding out from two gunshot wounds than surrender to
24 police.
25      So this Court cannot be assured that Mr. Beasley will

———TRANSCRIBED FROM DIGITAL RECORDING———

1   voluntarily appear, it cannot be assured that he won't harm
2   himself, and the Court cannot be assured that he won't cause
3   another stand-off with law enforcement when the time comes for
4   the defendant to answer for his deeds.
5           And for all those reasons, the Court should detain him
6   pending trial.
7           THE COURT:  Thank you, Mr. Lopez.
8           Mr. Draskovich?
9           MR. DRASKOVICH:  Your Honor, thank you.
10          Beginning with the pretrial services's report, as far
11  as the assessment of non-appearance, you know, the first two
12  factors, the nature of the instant alleged offense and
13  (unintelligible) behavior as noticed in the complaint -- or as
14  noted in the complaint, are basically the same thing.  Your
15  Honor is well aware of the Bail Reform Act, the nature and --
16  of the -- and circumstances of the alleged conduct -- criminal
17  conduct should be given the least amount of weight.
18          It goes on to state that factors should be his mental
19  health history.  And this gentleman has none.  That was
20  verified by him in his interview with pretrial services as well
21  as his wife's interview.
22          As far as financial assets that are inconsistent with
23  the defendant's reported income, you know, obviously we'll get
24  to that and review the evidence as it's produced in discovery.
25          I would submit that what the Government has pointed to

─TRANSCRIBED FROM DIGITAL RECORDING─

1  concerning the facts and circumstances of his arrest point to
2  remorse and point to a one-time, extreme emotional crisis that
3  he experienced that day FBI agents came to his home.
4          It should be noted that although he needed medical
5  attention and although he was in his house for nearly four
6  hours, no harm was attempted to the FBI agents when they'd
7  entered his home or were at the door. It appears that during
8  this period of extreme mental duress, the anguish, you know,
9  and the concern was pointed to himself, but nonetheless, he did
10 not take his life.
11         As far as the assessment of danger, again, it notes
12 the nature of the instant alleged offense and arrest behavior
13 as noted in the complaint, and I would submit they're one in
14 the same thing.
15         The third factor, mental health history, this
16 gentleman has none other than this one isolated day on
17 March 3rd.
18         This gentleman -- I spent some time with him this
19 morning through a video link -- has never been out of the
20 country. He does not own a passport. He has significant
21 family ties to this community. Family ties to this community.
22 In fact, his wife and his three sons are in my office for this
23 hearing and they completely support their husband and -- and
24 father.
25         I would submit that both as to assessment of

1 non-appearance and assessment of danger there are a combination
2 of conditions that can be imposed that would reasonably assure
3 that he present neither.  Obviously, there would be a firearms
4 requirement, that he's not to possess or have in his home or
5 anywhere (unintelligible) associated with a firearm.  I think
6 that would alleviate the Government's danger concerns.
7         This gentleman is willing to undergo electronic
8 monitoring, although he is not going anywhere.
9         In our discussion -- our lengthy discussion this
10 morning, he is ready to address some issues that were brought
11 up by the Government and move forward.
12         He'd be happy to -- I mean his wife would be happy to
13 serve as a third-party custodian or promisor for future court
14 appearances.
15         What happened on March 3rd is he was simply
16 overwhelmed and, in part based upon what the Government has
17 stated, it's understandable and it was an understandable
18 reaction, but it's not a course of conduct or a pattern of
19 conduct or a history of conduct that this gentleman has engaged
20 in.  It was a one-time deal.
21         Based upon these factors and these arguments and these
22 facts, I would urge the Court to release him with these
23 conditions and any other conditions the Court sees fit to
24 impose.
25         And on that, I'll submit it.

1    THE COURT: Thank you, Mr. Draskovich.
2    Of course, under 3142 -- 18 USC 3142, the Court must
3  determine by a preponderance of the evidence in this case
4  whether there are any conditions or combination of conditions
5  that will reasonably assure the defendant's appearance as
6  required in the future and by clear and convincing evidence
7  whether there is any condition or combination of conditions
8  that will ameliorate any danger that he may pose to the
9  community.
10    The Court read the complaint and, of course, has
11  listened to the presentation by both parties. The conduct that
12  occurred on the day that Mr. Beasley, the defendant, was
13  arrested is frightening and certainly of grave concern to the
14  Court.
15    With respect to danger of future -- of failing to
16  appear in the future and the preponderance of the evidence and
17  whether there are any conditions, the Court finds that there
18  are none, that Mr. Beasley has extraordinary resources at his
19  disposal.
20    And while the Court recognizes that he owns property
21  in the State of Nevada and has family in the State of Nevada,
22  that he is facing a substantial jail sentence should he be
23  convicted of either the crime in this charge or the underlying
24  offense that apparently led him to the desperate acts that
25  occurred on the date in March when he faced law enforcement,

1  those -- those desperate acts indicate to this Court -- and the
2  description of those desperate acts including bringing a gun to
3  a door that someone knows on the other side is federal law
4  enforcement and being willing to point that gun first at your
5  own head and then at law enforcement and then barricading
6  oneself in the home for four hours while you're bleeding --
7  indicates to me a desperation that cannot be addressed through
8  any condition or combination of conditions the Court could
9  fashion that would reasonably assure the appearance in the
10 future.
11         With respect to danger to the community, the Court
12 finds the nature and circumstances of the offense establish
13 clear and convincing evidence that there are no conditions or
14 combination of conditions the Court could fashion that would
15 reasonably ameliorate that danger.
16         While I appreciate the defendant's wife's willingness
17 to act as a third-party custodian for her husband, that
18 relationship did not in any way prevent the events that
19 occurred on the date that FBI showed up at his house, which are
20 extreme.
21         And while I appreciate that any guns might be removed,
22 there's no way to stop guns from reappearing whether that is
23 through associates or family or friends.  And given the
24 repeated statements regarding willingness to take one's own
25 life and the indication that he was willing to shoot law

1 enforcement cannot be ameliorated sufficiently through a
2 third-party custodian or home detention or GPS monitoring to
3 satisfy the Court.
4 　　　　The reports indicate that Mr. Beasley knew it was law
5 enforcement when he came to his door. He came to his door with
6 a loaded gun. He came to the door with a loaded gun willing to
7 kill himself. He came to the door with a loaded gun willing to
8 shoot law enforcement. He came to the door of his own home
9 with a gun. He aimed and waved that gun at law enforcement
10 even after they backed away and told him to drop the gun. And
11 then he barricaded himself in his home for over four hours
12 while he bled and was undoubtedly in pain and terrified for his
13 own future but apparently willing to continue to think about
14 taking his own life at that time as opposed to coming out.
15 　　　　This is not conduct that can be adequately addressed
16 through conditions the Court can impose.
17 　　　　The Court finds by clear and convincing evidence that
18 there are no conditions or combination of conditions that will
19 reasonably assure the safety of the community or by
20 preponderance of the evidence that there are no conditions or
21 combination of conditions that will reasonably assure
22 Mr. Beasley's appearance in the future.
23 　　　　And for those reasons, he is detained and remanded to
24 the custody of the U.S. Marshal Service until his next hearing
25 date.

-------TRANSCRIBED FROM DIGITAL RECORDING-------

1  With that, I must read the Brady admonition, which is
2  required by the Ninth Circuit, which states, under Criminal
3  Rule 5(f), the Government is ordered to comply with its
4  disclosure obligations under Brady vs. Maryland and related
5  cases.  Failure to do so may result in sanctions.  A written
6  order will follow.
7       Thank you, everyone.  This matter is adjourned.
8       (Whereupon, the proceedings concluded at 2:53 p.m.)
9                            * * *
10
11
12
13
14                          --o0o--
15              COURT REPORTER'S CERTIFICATE
16
17    I, SAMANTHA N. MCNETT, Official Court Reporter, United
18  States District Court, District of Nevada, Las Vegas, Nevada
19  certify that the foregoing is a correct transcript from the
20  record of proceedings in the above-entitled matter.
21
22  Date:  March 10, 2022
23
24                              /s/ Samantha N. McNett
                                Samantha McNett, RPR, CRR, CCR
25